IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

C.S. CHRISTOPHER, JR.                                                                       PLAINTIFF

V.                                                                       NO. 1:16-CV-126-DMB-DAS

RICHARD HILL, et al.                                                                     DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This employment discrimination action is before the Court on the defendants' motion for summary judgment. Doc. #48.

**I**
**Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal quotation marks omitted). On a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation marks and

alterations omitted"). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## II
## Factual Background and Procedural History

### A. The Civil War Battles of Tupelo and Brice's Crossroads

On June 10, 1864, during the height of the American Civil War, Confederate and Union forces met in a battle at Brice's Crossroads, a site located roughly twenty miles north of the City of Tupelo, Mississippi.[1] The battle, which involved approximately 12,000 troops, resulted in a victory for the Confederate forces. Over time, the battle would become known as the Battle of Brice's Crossroads.

About a month later, on July 5, 1864, Confederate and Union forces met again around Tupelo. This battle, which involved approximately 22,000 troops, resulted in a victory for the Union forces. Over time, this battle has been referred to as the Battle of Tupelo and the Battle of Harrisburg.

---

[1] The Court may take judicial notice of any fact which "is not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Accordingly, a court may take judicial notice of undisputed facts surrounding historical battles. *See, e.g., United States v. Osidach*, 513 F.Supp. 51, 93 (E.D. Pa. 1981) (taking judicial notice of World War II operations); *see also Cuyler v. Ferrill*, 6 F. Cas. 1088, 1091 (C.C.S.D. Ga. 1867) ("[T]he late Civil War being matter of public history,—a fact impressed upon the whole country,—is likewise judicially known to the courts; and from this general historical fact they will also take judicial notice of particular acts which led to it, or happened during its continuance, whenever it becomes essential to the ends of justice to do so.").

### B. C.S. Christopher Jr.

C.S. "Pete" Christopher Jr.,[2] is an approximately sixty-seven-year-old resident of Guntown, Mississippi. Doc. #48-3 at 5; Doc. #55-1 at ¶ 1. He has worked as a salesman "for most" of his working career and, over the last three decades, has "developed a deep appreciation" for soldiers of the Civil War. Doc. #55-1 at ¶ 1. In this regard, Christopher has "attended countless Civil War Re-enactments and [has] studied the Civil War battle through research, reading and seminars, especially the Brice's Crossroads Campaign." *Id*.

### C. 2009 Interlocal Cooperation Agreement

In February of 2009, the Mississippi cities of Baldwyn and Tupelo entered into an Interlocal Cooperation Agreement ("Agreement") with Lee County; Brice's Crossroads National Battlefield Commission, Inc. ("BCNBC"); and The Convention and Visitors Bureau of the City of Tupelo, Mississippi ("Bureau"). Doc. #48-1. The stated purpose of the Agreement was "to facilitate the development and interpretation of the Civil War Battles of Tupelo ('Harrisburg') and Brice's Crossroads ('Brice's') to be known as the Civil War Center." *Id*.

Section 6 of the Agreement provided for the creation of a Civil War Center Board ("CWCB" or "Board"). *Id*. at 2. Under the terms of the Agreement, the Board operates under the BCNBC and consists of seven members. *Id*. Lee County, Tupelo, and Baldwyn each appoint two members, while the Bureau appoints one. *Id*. The Agreement also authorized the Board to adopt regulations and policies to govern its operations. *Id*.

### D. The Board's Formation and Initial Meetings

Sometime after the execution of the Agreement: (1) Tupelo appointed Dick Hill and Ed Neelly to the Board; (2) Lee County appointed C.S. "Pete" Christopher and Rhett Russell; (3)

---

[2] The plaintiff's name is Clyde but he uses the first name Pete. Doc. #48-3 at 5.

Baldwyn appointed Jim Bishop and Jim Grisham; and (4) the Bureau appointed Neal McCoy. Doc. #55-4. The newly created Board held its initial meeting on March 3, 2010. *Id.* At this meeting, the Board approved a set of by-laws, approved Russell to serve as secretary, approved Grisham to serve as Chairman, approved Edwina Carpenter to serve as Russell's "assistant," and approved Neelly to serve as treasurer. *Id.*

Under the by-laws, decisions of the Board, including removal of a Board member, require an eighty-percent majority vote of the members present. Doc. #55-3 at 2–3. Additionally, of relevance here, Article XII of the by-laws provided:

> Section 1. CONTRACTS. The Board may authorize an officer or officers, agent or agents, to enter into any contract or execute and deliver an instrument in the name of the Board and such authority may be general or confined to specific instances. Any such contracts or instruments shall require the signature of the Chairman, Secretary and Treasurer upon the authorization of the Board. No contract shall be entered into for and on behalf of CWCB without prior approval of BCNBC.
>
> Section 2. LOANS. No loans shall be contracted on behalf of the Board and no evidence of indebtedness shall be issued in its name unless authorized by a resolution of the Board. Such authority may be general or confined to specific instances; however, any such contracts or instruments shall require the signature of the Chairman, Secretary and Treasurer upon the authorization of CWCB. No such loan shall be transacted for or on behalf of CWCB without prior approval of BCNBC.
>
> Section 3. CHECKS AND DRAFTS, ETC. All checks, drafts or other order for the payment of money, notes or evidences of indebtedness issued in the name of the CWCB shall be signed by such officer or officers or agent of the Board and in such manner as shall from time to time be determined by resolution of CWCB.
>
> Section 4. DEPOSITS. All funds of CWCB not otherwise employed shall be deposited from time to time in the credit of CWCB in such banks, trust companies or other depositories as CWCB may select.

*Id.* at 4–5.

At the March 3 meeting, the Board also voted that Christopher, Hill, Grisham, and McCoy would serve initial terms of five years, while the remaining Board members would serve initial

4

four-year terms. Doc. #55-4 at 1. At the expiration of these initial terms, the Board mandated two-year terms. *Id*. at 2. Although it is not apparent from the record, the defendants assert that Board members receive no compensation for their service. *See* Doc. #49 at 2.

About one month later, at an April 7, 2010, Board meeting, the Board approved the creation of a checking account and granted Carpenter "authority to pay all approved expenditures and sign checks for routine expenses." Doc. #55-8. The Board also approved a request to the City of Baldwyn for Carpenter to serve as Director of the Civil War Center ("Center") and for the City to provide her salary and benefits "beginning in the 2010-2011 operating year." *Id*. Later in 2010, Baldwyn approved this request and Carpenter became Director of the Center. Doc. #48-7 at 19.

### E. February 2014 Audit

In early 2014, Christopher became concerned about Carpenter's expenditures and recordkeeping. At an informal Board meeting on January 8, 2014, Christopher gave Hill a note requesting receipts for the Center's expenditures. *See* Doc. #55-17 at 1–2. Hill told Christopher that he did not think such documentation was necessary. *Id*. at 2. On February 1, 2014, Christopher sent Bishop and McCoy a letter expressing concerns regarding Carpenter's spending and recordkeeping and stating a desire "to see the receipts put [sic] the checks for our review." *Id*.

At some point, Christopher suggested to Hill that the Board utilize a third party to conduct an audit of the Board's finances. Doc. #55-1 at ¶ 4. Hill did not believe that a third-party audit was necessary; however, Russell agreed to conduct a partial audit. *Id*.

On February 27, 2014, Russell wrote Carpenter explaining that he had been appointed by the Board "to conduct a partial audit" of Carpenter's financial activities with the Center. Doc. #55-7 at 1. The letter asked Carpenter to provide justifications for numerous debit card purchases, mileage claims, and check purchases occurring between June and November 2013. *Id*. at 1–5.

5

About three weeks later, on March 13, 2014, Russell sent Carpenter a follow-up letter in which he requested additional documentation and explanations related to Carpenter's financial activities. *Id*. at 6–7.

Carpenter responded to Russell in an April 2, 2014 letter. *Id*. at 8–11. In her response, Carpenter conceded that she lacked receipts for fourteen expenses totaling $804.60 but asserted that "these expenses were for the Civil War Center and are very similar in nature to the expenses that I do have documentation for." *Id*. at 11. Carpenter also stated that she had requested reimbursement for an excess of $62.00 and would be "glad to handle this in a way that is satisfactory to the board either by reimbursing the Civil War Center or deducting the amount from future travel expense." *Id.*

### F. Christopher's Record Requests

Apparently unsatisfied with Carpenter's responses, on April 15, 2014, and again on May 9, Christopher wrote Hill complaining about Carpenter's expenditures and recordkeeping. Doc. #55-17. The May letter also requested a "record of the deposits in which TVB repaid the Center for Edwina's 3 trips to reenactments." Doc. #55-17 at 3.

On June 10, 2014, Christopher wrote a letter to the Board in which he (1) criticized the completeness and accuracy of minutes from a June 4 Board meeting; (2) expressed concerns about Carpenter's financial conduct; and (3) requested that Hill work with Carpenter to respond to certain questions Christopher had regarding the Board's finances. Doc. #55-14.

On June 28, 2014, counsel for Christopher sent a letter to Hill requesting various financial documents under Mississippi's Public Records Act. Doc. #55-15. Sometime after Christopher's counsel sent this letter, both Carpenter and Hill informed Christopher that he could review the records at "any time." Doc. #48-3 at 47. On July 7, 2017, Hill responded in writing to the June

6

letter, stating in relevant part:

> [Christopher] has and always will have access to any documents in our possession and they are available to him at the center. He is welcome [to] review any and all documents pertaining to the Interpretive Center and the way it does and has conducted business. A room will be provided for him and he is welcome to make copies to take with him. If he desires to bring an additional person to assist him, he or she will also be welcome.
>
> If Mr. Christopher desires for the board to instruct any paid employees to search, review and duplicate files or records we would refer to section 25-61-7 of the Public Records Act whereby we are entitled to collect reasonable fees calculated to reimburse the board for that expense. We do not waiver [sic] that right. No original documents will be allowed to leave the center.

Doc. #55-9.

Over the ensuing months, Christopher "was presented partial records and what [he] asked for was not presented." Doc. #55-1 at ¶ 6. Finally, on December 20, 2014, Christopher filed a Public Records Complaint with the Mississippi Ethics Commission. Doc. #55-21. The complaint states:

> On June 28th, 2014, I asked for access of all the checks, debit card records and cash receipts of the visitor center. I also asked for the records of all money received by the center. On August 25, I asked specifically for all of these records pertaining to the Simon Spite Estate. On September 25, I asked for all credit card statements of credit cards used by … the center. On October 3, I asked for the records on the Brices [sic] Crossroads Reenacting Operating Account.

*Id*. at 3.

### G. Christopher's Dismissal

On March 4, 2015, the Board convened for a regular meeting. *See* Doc. #48-3 at 78. At the meeting, Christopher and Neelly argued over the Board's expenditures. *Id*. at 78–79. During the argument, Neelly moved for Christopher to be dismissed because "he's contentious." *Id*. at 79. In the ensuing vote, Neelly, Hill, and Bobby Nichols[3] voted for Christopher's removal. *Id*.

---

[3] Bobby Nichols was not an original Board member. It is unclear when he was appointed.

Two unnamed Board members voted against dismissal. *Id*. Despite the vote failing to meet the eighty-percent threshold for removal, Neelly informed Christopher that he was "dismissed." *Id*. at 80. Christopher then left the meeting. *Id*.

Two weeks after the March 4 meeting, on March 18, 2015, the Ethics Commission acknowledged receipt of Christopher's complaint. Doc. #55-21 at 4. One week after that, the Board responded to the Ethics Commission, stating that it "complied with the requests made in the letter and with the intent of the law." *Id*. at 5.

On April 7, 2015, Christopher wrote Ben Logan, the City Attorney for Tupelo,[4] complaining that his dismissal violated Board by-laws and was in retaliation for his complaint to the Ethics Commission. Doc. #55-24 at 24–25. At the next Board meeting, eighty-percent of the Board voted in favor of Christopher's removal; however, contrary to the by-laws, no written notice was provided to Christopher of the removal. Doc. #55-27 at 18–19.

### H. This Action

On February 10, 2016, Christopher filed a four-count complaint against City of Tupelo, Neelly, and Hill, in the Circuit Court of Hinds, County, Mississippi. Doc. #1-1. The complaint asserted (1) "Claims for Wrongful Discharge for Whistle Blowing Under Mississippi Law;" (2) "State Law Claims Pursuant to the Mississippi Tort Claims Act;" (3) "Claims for Refusal to Provide Records Under Mississippi Law;" and (4) "Violation of United States Constitution Amendments One and Fourteen's Right to Free Speech."

Invoking federal question jurisdiction, Tupelo, Neelly and Hill timely removed the state court action to the Southern District of Mississippi on April 1, 2016, and answered the complaint three days later. Doc. #1; Doc. #3. On May 11, 2016, Tupelo, Neelly and Hill filed a motion to

---

[4] *See* Doc. #55-38.

transfer venue to the Northern District of Mississippi. Doc. #7. Christopher responded in opposition to the transfer motion on June 10, 2016. Doc. #10. On July 7, 2016, United States District Judge Carlton W. Reeves transferred the case to this Court where it was assigned to United States District Judge Sharion Aycock. Doc. #12.

On January 19, 2017, following a period of discovery, Christopher filed a motion to amend his complaint to add Carpenter and the Center as defendants and to "clarify" certain facts. Doc. #28. United States Magistrate Judge David A. Sanders granted Christopher's motion to amend on February 6, 2017. Doc. #30. Christopher filed his amended complaint three days later. Doc. #32. The defendants filed a joint answer to the amended complaint on March 10, 2017. Doc. #36.

On June 2, 2017, the defendants filed a motion for summary judgment. Doc. #48. Christopher filed a timely response, Doc. #55; and the defendants filed a timely reply, Doc. #56. On September 13, 2017, Judge Aycock entered an order of recusal and this action was reassigned to the undersigned district judge. Doc. #57.

### III
### Analysis

Christopher's amended complaint asserts the same four "counts" as his original complaint: First Amendment retaliation claims, state law claims under the Mississippi Tort Claims Act, claims under Mississippi's whistle blower statute, and claims under Mississippi's public records statute. *See* Doc. #32. The defendants seek summary judgment on all claims.

#### A. First Amendment Retaliation

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017).

To establish a § 1983 claim for employment retaliation related to speech, a plaintiff-

9

> employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action.

*Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 420–21 (5th Cir. 2017).

The amended complaint alleges that the defendants retaliated against Christopher based on "his continuing speech about the financial irresponsibility of the Center's employee/director, Edwina Carpenter, and the use of public funds." Doc. #32 at ¶ 26. The defendants argue that Christopher's First Amendment claims must fail for a variety of reasons, most notably that removal from a volunteer board is not an adverse employment action and that "the plaintiff cannot state a viable First Amendment claim because he did not speak on matters of public concern as a citizen …." Doc. #49 at 5.

Christopher's response to the motion for summary judgment dedicates only one paragraph to his First Amendment claims, and such paragraph wholly fails to respond to the defendants' arguments that he did not speak as a citizen on a matter of public concern or that his removal fails to amount to an adverse employment action. Doc. #54 at 19–20. This failure amounts to a waiver of the points argued and justifies summary judgment on Christopher's federal claims. *See TGIP, Inc. v. AT&T Corp.*, 512 F.Supp.2d 696, 712 (E.D. Tex. 2007) ("Courts have consistently held that inadequate briefing results in a waiver of a party's argument."). Regardless, even if the argument was not deemed waived, Christopher's First Amendment claims must fail.

First Amendment jurisprudence distinguishes between speech made by an employee pursuant to his or her official duties, which is not protected under the First Amendment, and speech that the employee engages in as a private citizen, which may be protected. *See Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) ("First it must be determined whether the employee's speech is pursuant to his or her official duties. If it is, then the speech is not protected by the First

10

Amendment."). Generally, "when a public employee raises complaints or concerns up the chain of command at his workplace about his duties, that speech is undertaken in the course of performing his job," and will not be entitled to First Amendment protection. *Id*. at 313 (collecting cases). "If however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id*.

There can be no serious dispute that Christopher's "continuing speech about the financial irresponsibility of the Center's employee/director, Edwina Carpenter, and the use of public funds," fell squarely within his duties as a Board member of the Center. Doc. #32 at ¶ 26. Likewise, there is no genuine issue of material fact that, before the March dismissal vote, all relevant speech by Christopher had been directed internally towards Board members or Carpenter herself. These internal communications were not citizen speech and are, therefore, not entitled to First Amendment protection. *See McKinney*, 518 F.3d at 312–13. While it is true that Christopher engaged in external communications when he filed an Ethics Commission complaint regarding the Board's failure to provide financial records and when he complained to the Tupelo City Attorney about procedural irregularities in his termination, such communications cannot support a claim for First Amendment retaliation because there is no evidence either precipitated Christopher's dismissal from the Board.

It is axiomatic that "speech could not have motivated [an] adverse employment action unless the defendant was aware of it." *Hays v. LaForge*, 113 F.Supp.3d 883, 904 (N.D. Miss. 2015) (citing *Wetherbe v. Smith*, 593 F. App'x 323, 328 (5th Cir. 2014)). Christopher's letter to the Tupelo City Attorney came after the Board had already voted (albeit improperly) in favor of Christopher's dismissal. Furthermore, there is absolutely no evidence that anyone on the Board

11

was aware of the Ethics Commission complaint before mid-March 2015 (approximately eleven days after Christopher was first dismissed), when the Commission first acknowledged receipt of the complaint. While there is no dispute that the Board had knowledge of these communications when it voted a second time to dismiss Christopher, causation cannot be established "where the adverse action was already ongoing at the time of the protected activity." *Young v. Westchester Cty. Dep't of Soc. Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003). To the extent the Board had already voted to dismiss Christopher before learning of the external communications, the Court concludes that there is no genuine issue of material fact as to whether Christopher's later dismissal was caused by such communications. Accordingly, Christopher's First Amendment retaliation claims must fail.

### B. Remaining Claims

Having determined that Christopher's federal claims must be dismissed, no federal question remains before the Court. In this situation, "the court must exercise its discretion whether to exercise supplemental jurisdiction." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999) (citing 28 U.S.C. § 1367(c)(3)). To this end, 28 U.S.C. § 1367, the supplemental jurisdiction statute, provides:

> The district courts may decline to exercise supplemental jurisdiction … [if] (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Courts in the Fifth Circuit treat the four circumstances enumerated in § 1367 as "statutory factors" to consider when evaluating supplemental jurisdiction. *Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011). "The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before

12

trial." *Watson v. City of Allen*, 821 F.3d 634, 642 (5th Cir. 2016).

Christopher's state law claims involve complex issues of state law, most notably the Board's and Center's status as state or public entities. The second statutory factor weighs in favor of remand because the state law claims predominate over the now non-existent federal law claims. The third statutory factor weighs in favor of remand because the federal claim will be dismissed by this order.

The fourth factor, which incorporates the "common law factors [of] judicial economy, convenience, fairness, and comity,"[5] also favors dismissal as the heavy balance of the common law factors weigh in favor of remand. Specifically, the judicial economy factor weighs in favor of remand because "at the time the federal claims were deleted hardly any federal judicial resources, let alone a significant amount of resources, had been devoted to the … consideration of the … state law claims (or to any claims)."[6] *Enochs*, 641 F.3d at 159. The third common law factor also weighs in favor of remand because there is no indication of prejudice resulting from dismissal and "it [is] certainly fair to have … the purely … state law claims heard in … state court …." *Id*. at 160. Finally, insofar as federal courts are "not as well equipped for determinations of state law as are state courts," the fourth common law factor of comity is served by remand. *Id*.; *see Diaz v. Estate of Lampton*, No. 3:09-cv-324, 2013 WL 3213087, at *16 (S. D. Miss. June 26, 2013) (dismissing state law claims "without prejudice so that a state court of competent jurisdiction may resolve them").

Upon consideration of the statutory and common law factors, the Court will decline to exercise supplemental jurisdiction over the state law claims and such claims will be remanded.

---

[5] *Enochs*, 641 F.3d at 159 ("The fourth factor also favors remand, as the heavy balance of the common law factors in favor of remand constitutes another compelling reason to decline jurisdiction.").

[6] Aside from this order, the Court has issued only procedural orders.

# IV
## Conclusion

For the reasons above, the defendants' motion for summary judgment [48] is **GRANTED in Part and DENIED in Part**.  The motion is GRANTED to the extent it seeks summary judgment on Christopher's First Amendment retaliation claims.  The motion is DENIED to the extent it seeks summary judgment on Christopher's remaining claims, which are **REMANDED** to the Circuit Court of Hinds County.

**SO ORDERED**, this 27th day of December, 2017.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**